## 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

### KENT'S ADM'R v. KENT'S ADM'R AND ALS.

#### JULY 1st, 1886.

1. CHANCERY PRACTICE—*Pleadings—Evidence.*—A court of equity can only decree upon the case made by the pleadings, though the evidence may show a right to a further decree. *Munday* v. *Vawter*, 3 Gratt. 494.
2. IDEM—*Res judicata.*—Where in suit charging two administrators with a joint *devastavit* of their intestate's estate, and they jointly excepted to the master's report wherein they were charged with said *devastavit*, and the court sustained said exception, one of those administrators cannot afterwards be heard to charge his co-administrator with the same *devastavit* whereby a debt due by the estate to the alleger was lost. The decree sustaining the exception is the law of the case, binding upon the parties and all claiming under them.
3. *Case at bar.*—Complainant wholly fails to sustain by evidence that the equitable defence set up by him against the defendant's judgment against him.

Appeal from decree of circuit court of Wythe county, rendered March, 1884, in a chancery cause wherein Gordon C. Kent's administrator was complainant and James R. Kent's administrator and others were defendants. The object of the suit was to obtain relief in equity and to perpetually enjoin a judgment obtained March 12th, 1874, on the law side of said circuit court, by the said defendant against said complainant for $5,600, with interest from June 6th, 1845, till paid, subject to several credits. The decree dissolved the injunction and dismissed the bill.

Opinion states the case.

*Joseph W. Caldwell* and *W. H. Bolling*, for the appellant.

*W. R. Staples*, for the appellees.

RICHARDSON, J., delivered the opinion of the court.

This is a controversy between the administrators of two bro-
thers who were the joint administrators of a deceased brother.

In February, 1850, David F. Kent, of Pulaski county, died
intestate, leaving a widow and children, and besides being
seized and possessed in his own right of some real estate in the
counties of Wythe and Pulaski, and a very large and valuable
personal estate, consisting of slaves, horses and cattle, farming
implements, and household and kitchen furniture, was pos-
sessed of a very valuable real estate in said county of Pulaski,
in right of his wife, on which he, with his family, resided.

On the 7th of March, 1850, James R. Kent, of the county of
Montgomery, and Gordon C. Kent, of the county of Wythe,
two brothers of the intestate, David F. Kent, duly qualified as
administrators, executed as such a joint bond in the penalty
of $75,000, and jointly administered the estate, each receiving
and disbursing large sums, and each actively participating in
the settlement of their administration accounts, hereinafter to
be referred to; though James R. Kent, the senior of the two,
seems to have been regarded as the active administrator, as he
lived near the home of the decedent, and was necessarily
brought more directly in connection with his affairs.

Very soon after the qualification of these administrators the
personal estate of David F. Kent was duly appraised by David
McGavock, Isaac Hudson, and William Miller, three of the
commissioners appointed for the purpose by the county court
of Pulaski, and the appraised value thereof was by these com-
missioners fixed $38,696.   There was no regular sale of the

personal estate, and hence no sale bill was ever returned, though some of the slaves were sold by James R. Kent, one of the administrators. These sales amounted to some $7,000, all of which was accounted for by him.

The fact that there was no regular sale of the personalty, and no sale bill returned, seems to be accounted for in the fact that James R. Kent, doubtless then not fully advised of the great and wide spread indebtedness of his deceased brother, David F. Kent, and being loth to subject the widow of his brother to the mortification of a sale of the personalty, especially the negroes which had come by her, conceived the laudable idea that by keeping the negroes and other personalty on the valuable real estate of Mrs. Kent, the widow, the indebtedness of her husband could, in a reasonable time, be discharged from the profits of this fine grazing farm, together with the proceeds of the sale of the real estate owned by the intestate in his own right, and thereby save this valuable slave property for the widow and children. The widow, naturally anxious to attain this desirable object, agreed to waive her right of dower in her husband's said real estate, and that the entire proceeds thereof, together with the profits of her farm, after deducting necessary expenses for the support of herself and family, should go to the discharge of her husband's indebtedness, the farming and grazing operations to be conducted under the management and control of James R. Kent. Hence, at the first settlement of their administration accounts after their qualification, these administrators were charged with the entire amount of said appraisement. The settlement here referred to is the "reformed" report of Commissioner John D. Howe, made in 1857 in obedience to an order of court in the suit of James R. and Gordon C. Kent against A. S. Rutherford, one of the general creditors of David F. Kent's estate; and by it the estate was then indebted to the administrators in the sum of $31,257, as

of the 7th of March of that year. The record shows that this heavy burden of advances for the estate was, in the main, borne by the senior administrator, James R. Kent.

David F. Kent, at his death, was much more largely indebted than was at first supposed, and, among others, he owed large debts to each of his brothers, James R. and Gordon C. Kent, who became his administrators, neither of whom took any specific steps for the collection of the debts due them, but both, so far as shown by the record, submitted to being charged with the entire appraised value of the personalty, and proceeded to pay off the general creditors other than themselves—the result being a heavy loss to each of them, owing mainly to the loss of this large slave property by the war.

So much as a necessary introduction of the real matter of controversy in this suit. Entirely aside from, and prior to the administration by James R. and Gordon C. Kent upon the estate of David F. Kent, Gordon C. Kent was indebted to James R. Kent in the sum of $5,600, the real subject here in controversy, and for this sum James R. Kent held the bond of his brother, dated June 6th, 1845. At the death of James R. Kent, which occurred in 1857, this bond passed into the hands of his executors, and a suit at law was brought thereon in their names against Gordon C. Kent, in his lifetime, in the circuit court of Wythe county, and the said Gordon C. Kent having died after the suit was brought, judgment was afterwards, to wit, on the 12th day of March, 1874, recovered in the said circuit court against D. C. Kent, his administrator, for said sum of $5,600, with interest thereon from the 6th day of June, 1845, subject to the several credits specified in the judgment.

In June, 1874 (the executors of James R. Kent having been discharged, and Isaiah H. Welsh having qualified as administrator *de bonis non* with the will annexed of James R. Kent,

deceased), D. C. Kent, administrator of Gordon C. Kent, presented to the judge of the circuit court of Wythe county his bill praying for an injunction to said judgment at law. After minutely detailing the circumstances connected with the qualification of James R. and Gordon C. Kent as the administrators of David F. Kent; after alleging that the assets together with the profits of the farm, were sufficient to discharge all legal demands against the estate of David F. Kent, the bill alleges that upon the settlement of the administration accounts in 1857, all the money paid by Gordon C. Kent, as administrator, and the debts due him by David F. Kent were passed to the joint administration account, the effect of which was to give James R. Kent credit to that extent, and that this was done upon the positive promise of James R. Kent that the whole amount due Gordon C. Kent should be paid. That it was agreed between the two at the time Gordon C. Kent permitted the indebtedness to him to be placed thus to the credit of James R. Kent, that the balance then remaining unpaid upon the bond of $5,600 (the subject of controversy here), was thereby discharged, and that James R. Kent should pay to Gordon C. Kent the amount due him from the estate of David F. Kent in excess of the amount due from Gordon C. to James R. Kent on said bond; the latter to pay such excess to Gordon C. Kent when the debts due to strangers were all paid, and that James R. Kent, either from accident or negligence, failed to endorse upon the bond that it was discharged, or to surrender the same. And the complainant in his bill insists not only that the $5,600 debt was discharged by this arrangement, but that he is entitled to a decree against the estate of James R. Kent for the said excess. Such is the foundation of the claim asserted by the appellant, and thus commenced this protracted and expensive litigation.

The administrator of James R. Kent demurred to and answered the bill. The answer denies the liability of respond-

ent's testator's estate for or on account of the alleged indebtedness of the estate of David F. Kent to Gordon C. Kent; denies the agreement and promise alleged in the bill to have been made by James R. Kent in his lifetime to Gordon C. Kent; in fact, denies every material allegation in the bill; insists that the alleged agreement, not in writing, was, if made, invalid, and relies upon the statute of limitations.

Notwithstanding the previous approved settlement of the administration accounts by Commissioner Howe in 1857, and although similar settlements were ordered, and made on the same basis, touching the said administration, in the years 1858, 1859, 1866, and 1868, respectively; yet, in this suit, further accounts and settlements were ordered, and the commissioner, C. B. Thomas, stated and reported a settlement wholly different from any general statement ever made in any one of the suits touching the actings and doings of these administrators, or ever sanctioned by any court in connection therewith. He charges James R. Kent with $54,000, *estimated value of the slaves*, as though he had converted them to his own use; he charges him also, on same basis, with $10,000 of personal property, consisting of horses, cattle, hogs, sheep, household and kitchen furniture, and farming implements and utensils, all of which had in all other settlements been charged jointly to the two administrators. Of this report, it is only necessary to say, that, except as to a few items charged to Gordon C. Kent, not before charged to him, it is wrong in principal and is not sustained by satisfactory evidence, and, with the exceptions mentioned, was repudiated by the court. And this commissioner also charged James R. Kent with $2,300 annually for eleven years, the estimated profits of the widow's farm during that period; this item having been rejected in every previous general settlement from the time of the corrected report of Com-

missioner Howe, in 1857, and only once thereafter embraced in a special statement, when it was excepted to and repudiated by the court as an improper charge.

The cause was finally heard at the March term, 1884, of said circuit court, when a decree was pronounced, which rejected the estimated values reported by Commissioner Thomas; adhered to the settlement made in the Rutherford suit in 1857, as to the amounts to be charged to James R. Kent on account of the profits of farm, and, among other things, not necessary to be here referred to, decreed that the injunction theretofore awarded on the original and amended and supplemental bills be dissolved, and that the said bills be dismissed. From that decree the case is here on appeal.

It becomes important to enquire, in the first place, what is the case made by the bill? The well settled rule of pleading is, that if a party is entitled to recover at all, he must recover on the case stated in his bill. And, although the plaintiff may make out a case which under other circumstances would entitle him to the aid of the court, yet if it is not the case made by the bill, he cannot recover. 2 Rob. Pr. (old ed.) 288; *Grigsby* v. *Weaver*, 5 Leigh, 215; *Munday* v. *Vawter*, 3 Gratt. 494.

The specific ground of relief relied upon in the bill is not that sufficient assets came to the hands of James R. Kent, as administrator, or that by reason of assets received by him, he promised to pay the debts due Gordon C. Kent from the estate of David F. Kent; nor does the bill allege any such promise or undertaking on the part of James R. Kent as that attempted to be set up upon the evidence of George Anderson and Dr. James Kent, as detailed in their depositions. On the contrary, the real ground of equity relied on in the bill is the alleged promise of James R. Kent, that if Gordon C. Kent would agree that his debts against the estate of David F. Kent

should be placed to the credit of James R. Kent in the settlement of the administration accounts had in September, 1857, in the suit of *Kent's Adm'r* v. *Rutherford*, then the bond in controversy should be thereby discharged, and that any balance due Gordon C. Kent, over and above the amount of said bond, would be paid to him by James R. Kent.

We may ask, in the first place, is the alleged agreement and promise proved; is the specific ground of relief relied on established by evidence? We think not. The object attempted in this suit was to defeat the collection of a plain judgment at law, founded on a written obligation of the most solemn nature, by mere parol proof of oral declarations or admissions of a party long since dead, alleged to have been made more than twenty years before the proof was offered. Such evidence, under such circumstances must, in the nature of things, always be regarded as unreliable and insufficient. Hence, in *Lench* v. *Lench*, 10 Vesey, 511, 517–18, it is said "that in all cases it is most unsatisfactory evidence on account of the facility with which it may be fabricated, and the impossibility, too, of contradicting it. Besides, the slightest mistake or failure of recollection may wholly alter the effect of the declaration." See, also, the opinion of Staples, J., in *Phelps* v. *Seely*, 22 Gratt. 573, where the subject is fully discussed.

The appellant introduced these witnesses, and upon their testimony his case in the main rests. They are Dr. Kent, Geo. Anderson, and C. A. Venable. The substance of Dr. Kent's testimony is as to a conversation in his presence between Jas. R. Kent and Gordon C. Kent, in which the former said to the latter he need not be uneasy, there would be nothing between them; that what Gordon owed James R. Kent would be about equal to what Gordon Kent had paid for David F. Kent. It is too obvious to need argument, that this witness falls far short of proving the alleged agreement and promise. More-

over, there is, considering the circumstances, a palpable absurdity in the statement itself. For, at the time of the conversation referred to, James R. Kent's debt against Gordon C. Kent (the debt in controversy) was some $10,000; and, according to the deposition of John H. Howe, taken by appellant, Gordon C. Kent, in September, 1857, only claimed that he had paid for David F. Kent about $5,000, whilst he had received assets to the amount of $2,500. Is it not, then, incredible that Jas. R. Kent, a safe and thorough business man, could have regarded Gordon Kent's claim, according to his own showing, as about. equal to what he (Gordon) owed to James R. Kent, or that the latter could have said, or intended to say, that he would surrender to Gordon the debt of $10,000 for the paltry consideration of having placed to his credit, in the settlement of the administration accounts, the comparatively insignificant sum thus claimed by Gordon C. Kent against the estate of David F. Kent. The very statement itself is stamped with improbability and ought to be its own refutation. Again, Howe, in his deposition, says if he had made a separate settlement with Gordon C. Kent, he, Gordon, would have been charged with $2,500 assets received, and credited with vouchers to the amount of about $5,000, and some $13,000 claimed by Gordon C. Kent against the estate of David F. Kent. Yet, according to Dr. Kent's statement (if it could even be taken as tending to prove the alleged agreement and promise), the debt in controversy, amounting to $10,000, due from Gordon C. to James R. Kent, was discharged by Gordon's claim of about $2,500 against David F. Kent's estate being passed to the credit of James R. Kent. Evidently, the conversation referred to by Dr. Kent was either wholly misunderstood by him, or else his memory is at fault.

George Anderson, another witness, speaks of conversations between James R. and Gordon C. Kent prior to the year 1856,

more than twenty years before the deposition was given, in which Gordon C. Kent is represented as saying he had paid debts of David F. Kent's estate, for which the estate was indebted to him; and that James R. Kent said, "Yes, Gordon, you are owing me on what is coming from my father's estate, and it can be paid in that way." It cannot be necessary to say or do more than call attention to the palpable difference between Dr. Kent's version of the alleged conversation between these brothers and joint administrators in his presence and the conversations alleged to have taken place in the presence of Mr. Anderson. The witnesses do not agree, and neither of their statements sustain, or tend to sustain, the averments of the bill. According to the statement of Mr. Anderson, what was due Gordon C. Kent from the estate of David F. Kent, although greatly more than the amount of his debt to James R. Kent, was to be set off against that debt, nothing appearing to have been said with reference to the supposed balance due Gordon C. Kent. One of these witnesses is necessarily mistaken; and, according to the averments of the bill, both are mistaken. The bill alleges that in 1857, in consideration that Gordon C. Kent had permitted the amount due him from David F. Kent's estate to pass to the credit of James R. Kent in the settlement of their administration accounts, James R. Kent agreed to surrender the debt in controversy to Gordon C. Kent, and to pay him the excess. In the light of the facts and circumstances disclosed by the record, who can undertake to say which of these agreements was entered into—that set forth in the bill, or the one stated by Dr. Kent, or that testified to, by Mr. Anderson, or who can say that either one is sustained by evidence?

There is but one other piece of evidence prominently relied on to sustain the appellant's case, as stated in the bill, and that is the testimony of Mr. Charles A. Venable, who says he was

at the residence of Major James R. Kent in August, 1866, in company with Gordon C. Kent, to deliver to Major Kent a lot of cattle and to collect the money for the same. This witness enters into the details of a conversation which he says took place between James R. Kent and Gordon C. Kent. He says the conversation commenced in Maj. Kent's parlor; that Gordon C. Kent called on Maj. James R. Kent for "a note or bond amounting to over $5,000" (the precise amount he did not recollect), "which Gordon C. Kent had paid by and through the estate of David F. Kent; that Major .Kent readily agreed that the note had been paid or collected, and was among his papers, and, if ever found, should be returned to him; that Maj. Kent stated that the Yankees had scattered and destroyed many of his papers, and that the bond might be among those so destroyed; that soon after the conversation commenced in the parlor James R. and Gordon C. Kent went out and into the office in the yard, where Maj. Kent's papers were in boxes and barrels, and as the Yankees left them, and that a search, lasting one hour and a half, in the office, was made for the bond, but without finding it, and that Major Kent then told Gordon C. Kent to rest satisfied, that the note was paid, and never should bother him if found, and further said if the note was found it should be returned to him. This witness also says that a few days before this visit to Maj. Kent's he, Venable, took a letter from the postoffice to Gordon C. Kent, who told him the letter was from Major Kent, and was about the note, and that on their way to deliver the lot of cattle to Major Kent, Gordon C. Kent said "that he was going to get that note."

It is needless to comment on the testimony of this witness further than to show he is contradicted in many important particulars, either by direct testimony or by the surrounding circumstances. Mr. Venable says that Miss Lizzie Kent, Major

Kent's daughter, and a Mr. St. Clair, were present during a part of the conversation. He is contradicted by both of them, neither of whom heard any such conversation. Indeed, Miss Lizzie Kent was not at home on the occasion referred to, but met her Uncle Gordon on his way to deliver the cattle—she going on a visit to Pulaski, where she remained for a week; and she says she never saw Mr. Venable but once, and then at her father's house on a different occasion from that on which the cattle were delivered.

St. Clair testifies to hearing nothing, except from Gordon C. Kent, and that after he (Gordon) had left Major Kent's, the latter not being present. Mr. Venable says that they went into the office for the bond, and that the papers in the office were in a confused mass in boxes and barrels. It is proved that Major Kent did not keep any of his valuable papers in the office, and that the papers in the office, so far from being in boxes and barrels, were scattered over the floor, just as the Yankees left them about the time of the battle of Cloyd's Mountain, in May, 1864.

Mr. Venable says that James R. and Gordon C. Kent, in his presence, spent about one hour and a half in the office looking for the bond. It is proved that Major Kent was at that time so blind that he could not read or write, and could not distinguish his own children, except by their voices. Moreover, if, as intimated by Mr. Venable, Major Kent had written to Gordon Kent about the note, and the latter went on the occasion in question, not only to deliver the cattle, but to "get that note," why was not a letter of such importance to Gordon C. Kent preserved, and why is it not produced? Why, too, if it be true, as stated by the witness Venable, that Gordon Kent went to get the bond, and Major Kent so promptly agreed to give it up, did it not occur to Gordon C. Kent to say to his brother "life is uncertain; the bond cannot be found; it is a

matter of grave importance to me; give me a receipt—some°
writing to show the bond is discharged!" From the statement
of the witness as to what Gordon C. Kent told him on the
reception of the letter and on his way to deliver the cattle, the
fair inference would be that Major Kent had written to Gordon
Kent to come and get the bond. Yet, the record contains a
letter from Gordon to Major Kent, dated 16th November, 1866,
proposing to sell the latter a lot of sixty or seventy head of
cattle, in which there is no reference to the bond whatever;
and if this is the same lot of cattle, as we must presume it was,
which the witness Venable helped to deliver, then it is obvious
that Mr. Venable was not at Major Kent's in August, 1866,
but must have been there some time subsequent to the 16th of
November, 1866, the date of Gordon Kent's letter to Major
Kent. This fact is all the more clear and important when we
remember that Miss Lizzie Kent says the cattle were delivered
in the fall, when the leaves were falling; and we know that
autumn leaves do not fall in August.

There is, moreover, indubitable proof, not only that there
was no such agreement and promise, as alleged in the bill,
but that Gordon C. Kent never claimed that the bond was dis-
charged by any such arrangement or in any other way. It is
contended by the appellant that Gordon C. Kent urged that
the negroes be sold to pay the debts of David F. Kent, and
that he only acquiesced in Maj. Kent's plan to keep the negroes,
operate the farm, and pay off the debts, upon the express
agreement and promise of Maj. Kent as alleged in the bill.

After the death of Maj. Kent, the bond in question was
placed in the hands of Staples & Wade by the executors of
James R. Kent for collection. The deposition of Judge Waller
R. Staples, who was then the senior member of the law firm
of Staples & Wade, is in the record. Judge Staples presented
the bond to Gordon C. Kent for payment, and had several

interviews with him on the subject, in which Gordon Kent claimed that he had offsets against the bond, and said he had a debt against the estate of David F. Kent; that he, as one of the administrators of David F. Kent, was anxious that the negroes be sold to pay all the debts, his own included, but was overruled by Maj. Kent, the other administrator, who thought the debts might be paid out of the rents and profits of the land, and that he, Maj. Kent, would see that his, Gordon Kent's, debt was saved.   Judge Staples told Gordon C. Kent that he could not tell anything about the truth of his, Gordon's, statement; that even if true, there were insuperable difficulties in his way—(1st) the promise was barred by the statute of limitations; and (2) the promise was not in writing, and Maj. Kent's estate could not be held responsible; and, moreover, that he had as much right to control the sale of the negroes as Maj. Kent.   Gordon C. Kent showed Judge Staples a lot of . offsets claimed by him, all or most of which were barred by the statute, but Gordon C. Kent said he thought the heirs would not oppose to them technical objections, but would allow them.

It was finally agreed between Judge Staples and Gordon C. Kent, that the latter, with his counsel, should meet the representatives of Maj. Kent, or some of them, at the office of Staples & Wade, in Christiansburg, in order to ascertain whether the offsets claimed would be allowed.   After this appointment for a conference, to wit, on the 10th of March, 1868, Gordon C. Kent wrote to Francis Bell, one of the executors of Maj. Kent, and, after referring to his interviews with Judge Staples, said : "My bond lacks several credits that ought to appear on it, which Mr. Staples did not feel authorized to give, which I have no doubt, when explained to the executors by me, will be allowed."   He then concluded his letter by referring to the agreement for a conference made with Judge Staples, asked

that the day be fixed, and he notified, &c. Judge Staples states that he has no recollection whatever that Gordon C. Kent, in either one of his interviews with him, ever claimed any such agreement as alleged in the bill, or any offset against the bond other than those referred to.

According to agreement, the parties met at the office of Staples & Wade. Gordon C. Kent with his counsel, Mr. R. C. Kent, and Mr. Cowan, a son-in-law of Maj. Kent, and Mr. Otey, one of his executors, and Staples & Wade, counsel for Maj. Kent's estate.

Judge Staples states distinctly that at this conference, Col. Wade made a memorandum in writing of the several matters under consideration between Gordon C. Kent and the representatives of Maj. Kent's estate, one of them being the $5,600 bond in controversy. Col. Wade's deposition is in the record here, and having preserved the said memorandum in writing made by him, he files it with, and as part of, his deposition. In connection with this bond in controversy, it is stated: " *Gordon C. Kent says* this is all right, but not enough credits on it."

Such were the acts and admissions of Gordon C. Kent in his lifetime, when Maj. Kent's death made it comparatively easy for Gordon C. Kent to avail himself to the fullest extent of the benefit of the supposed facts testified to by Dr. Kent, Mr. Anderson and Mr. Venable; yet Gordon Kent does not assert the claim put in his mouth by these witnesses, but the contrary, and neither of these witnesses were called on to be at this, to Gordon Kent, most important conference, nor is either of them heard of in this connection until they appear as witnesses in this case after the death of Gordon C. Kent. How is it possible to reconcile these stubborn, unbending facts, these unqualified admissions of Gordon C. Kent himself, made long after the mythical conversations testified about by these witnesses, with either the claim alleged in the bill or the incon-

sistent and clashing statements made by the witnesses? They are irreconcilable, and cannot be explained upon any theory other than that the conversations testified to never occurred or were wholly misunderstood by the appellant's witnesses.

Gordon C. Kent did yet another act which forever excluded him and his representatives from any claim against the estate of Maj. Kent, on the grounds set forth in the bill. On the 15th day of April, 1862, nearly five years after the alleged agreement with Maj. Kent, about twelve years after the two had qualified as administrators, and during which time they had jointly acted as such, and in the lifetime of Maj. Kent, against whose estate this claim is asserted, he, Gordon Kent, wrote to the widow of David F. Kent as follows, to wit:

"Dear Elizabeth:

"I have deferred collecting some claims for a long time due me by estate of D. F. Kent, hoping that they could be more easily paid by waiting. We have paid all that was due to other persons. I think it is now time I should be getting something due me. The estate owes me several thousand dollars in bonds and accounts, which will amount to eighteen or twenty thousand dollars, which I should like to have settled without going to law, and cannot defer longer. * * * * * If you are willing that I shall be paid, I owe brother James seven or nine thousand dollars, which you may probably arrange to get as an offset in part. I have no disposition to distress you or yours, and hope you will not compel me to go to law to get what is justly due to me, and the loss to me in waiting for it has been very serious. Please let me hear from you soon on the subject.

"Yours truly, &c.;

"G. C. Kent."

This letter speaks in no uncertain terms; it shows there never was, and that Gordon Kent never claimed that there was, any such agreement as alleged, by which his bond to James R. Kent had been discharged; and it is, too, the death knell to every pretension of claim against the estate of James R. Kent. How, we ask, could the estate of David F. Kent be indebted to Gordon Kent, if James R. Kent had in 1857, five years before, assumed that debt? How could it be necessary, or even possible, for Mrs. Kent to offset Gordon's claim by the amount of Gordon's indebtedness to James R. Kent, if that indebtedness had been five years before discharged by the alleged agreement between James R. and Gordon C. Kent? And why should Gordon Kent make the claim against the estate of David F. Kent in 1862, and deprecate the necessity of going to law with his sister-in-law therefor, if, as alleged in the bill, it be true that James R. Kent was bound for it by the agreement alleged to have been made in 1857? Looking to the indubitable proofs disclosed by the record, the fact is, there never was, nor is there now, any just foundation for the claim asserted; and all the pretensions of the appellant to the contrary are but idle fancies.

The under stratum of the appellant's claim is the charge that Major Kent's estate is liable as for a *devastavit* committed by him in taking charge of the negroes and not selling them; and many authorities are referred to by counsel for appellant—authorities applicable to cases of assets lost by the negligence or misconduct of administrators, but having no application to the case in hand.

It cannot, in the view of this case already taken, be necessary to discuss the wild and unreliable estimates of value placed upon the personalty by Commissioner Thomas many years after it was appraised in due form by men of capacity and experience, and with the property before their eyes. The

negroes alone were estimated by this commissioner at $54,000—a sum greatly in excess of the value of the entire personal estate, as fixed by the appraisers. Suffice it to say, these extravagant estimates were rejected, and rightly rejected, by the learned judge of the circuit court.

Nor is it necessary to enter into a lengthy discussion as to the slaves, except to say it is too plain to admit of controversy, that the negroes came to the hands of, and were retained and not sold by the joint act of both administrators, and not by James R. Kent alone, one of them. The retaining of the negroes was the joint act of both administrators. The control of them by Major Kent on the farm was his individual act, in which Gordon C. Kent acquiesced. The negroes were not lost by the negligence or misconduct of the administrators, or either of them. They and all else that came to the hands of the administrators have been greatly more than accounted for, in a generous effort to pay off the debts and keep the negroes for the benefit of the widow and children of their dead brother. Their scheme succeeded so far as to pay all the general creditors, save themselves, the burden of which fell in the main on Major Kent. Their enterprise was a joint one, and they must so bear their respective losses, which come from no fault of theirs, but from the act of government. But for the emancipation of the slaves by the war, these administrators would have had indemnity at least to the extent of their value. Their scheme having to this extent failed, neither of them nor their representatives have any right to complain of the other as respects the loss of the negroes. The record is replete with evidence, and Gordon Kent well knew the fact, that all the assets which came to the hands of Major Kent were long ago applied to debts of the estate, and his letter to Mrs. Kent, above referred to, shows the fact—else, why did he say, "We have paid all that was due to others." This

letter, too, with many other circumstances disclosed by the record, shows Gordon C. Kent's entire concurrence and acquiescence in the plan of retaining the negroes. This acquiescence cuts him off from any claim against the estate of Major Kent. 2 Pom. Eq. 846–17, 820, 916.

Besides the Rutherford suit, there was the Otey suit, a controversy between these administrators and one Otey, a general creditor of the estate. This suit was under the special supervision and direction of Gordon C. Kent; it originated in Wythe county, was removed to Washington county, where it slept during the war, was then removed back to Wythe, and finally to Montgomery, where it was ended since the war. In this suit this very question about liability for the negroes emancipated by the war was passed on. These administrators jointly excepted to a commissioner's report charging them with the appraised value of the negroes, with which they had been charged before the war in the Rutherford suit. The exception is in this language: "Complainants except to so much of this report as charges them with the value of the slaves of David F. Kent, because said slaves were, without the fault of these complainants, by the act of the government, freed and emancipated." This exception taken by Gordon C. Kent was necessarily sustained by the court, in its order perpetuating the injunction in that suit, which had been awarded to prevent the sale of these very slaves under an execution in favor of a general creditor. In that suit Gordon C. Kent had, at the start, claimed the right to retain the slaves upon the ground that the administrators had been charged with them at their appraised value, had accounted for them and all other assets that came to their hands, and were largely in advance to the estate. So far as the proceedings and decrees in that suit could do so, they were protected—and they did. From the decree perpetuating the injunction in that case no

appeal was ever taken. It is the law of the case, binding upon the parties, and all claiming under them. Gordon Kent's personal representative cannot avoid the effect of that decree. He is not only bound by the decree, but by the solemn admissions made by his father in the bill in that case, which outweigh all the parol evidence adduced by the appellant. 1 Green. Ev., § 27, 207–8, 427–531 and note; 3 Williams on Ex'rs, 1013.

It is unnecessary to pass on the other questions presented. We are of opinion that the decree of the circuit court appealed from is entirely correct, and the same must be affirmed.

DECREE AFFIRMED.