See Dravo v. Fabel, *infra*.

---

Dravo and others, Assignees, etc., *v.* Fabel and others.

*(District Court, W. D. Pennsylvania.* August 25, 1885.)

1. WITNESSES—EXAMINATION OF PARTY TO SUIT—PENNSYLVANIA STATUTE.
   The Pennsylvania statute, which provides that a party to the record, when called by the adverse party, may be examined as if under cross-examination, is not applicable to a suit in equity in a court of the United States.

2. SAME—HOSTILITY OF WITNESS—IMPEACHMENT—CONTRADICTION.
   Where a party is called by the opposite party, he stands in a different position from an ordinary witness; he is necessarily hostile to the party calling him, who is not bound by what he testifies. It may be that he cannot be directly impeached by the party who called him, but he may be freely contradicted, even though this may incidentally discredit him.

3. SAME—EFFECT OF TESTIMONY OF PARTY.
   But a party who has voluntarily put his adversary on the witness stand cannot insist that his testimony be ignored if it happen to disappoint him. It is competent testimony in the case, and, unless self-contradictory or inherently improbable, it must prevail in the absence of countervailing evidence.

4. DEED—EFFECT OF DELIVERY.
   By the law of Pennsylvania a deed takes full effect by mere delivery, without recording.

5. FRAUDULENT CONVEYANCE—EVIDENCE.
   The evidence in this case stated and discussed, and *held*, that it fails to sustain the charge contained in the bill, but denied by the answer, that certain deeds of conveyance were executed in fraud of the creditors of the grantor.

In Equity.
*J. H. McCreery, W. S. Pier,* and *D. T. Watson,* for complainants.
*H. W. Weir* and *Knox & Reed,* for respondents.

ACHESON, J.   The purpose of this suit is to set aside two deeds of conveyance from John Dippold and wife to Philip Fabel and Kate Fabel, (*nee* Dippold, and daughter of the grantors,) his wife, one dated January 22, 1876, for a tract of about 11 acres of land, reciting a consideration of $10,000; the other, dated January 26, 1876, for a tract of 237¾ acres of land, reciting a consideration of $18,000; all .situated in Beaver county, Pennsylvania.   Both deeds purport to have been acknowledged January 26, 1876, but they were not recorded until February 16, 1878.   On March 1, 1878, John Dippold and his copartners in the firm of John Dippold & Sons were adjudged bankrupts, upon a petition filed February 28, 1878.   The plaintiffs are the assignees in bankruptcy of John Dippold, and they attack said

deeds for actual fraud; the bill charging that they were made with the intent and purpose of delaying, hindering, and defrauding the creditors of John Dippold, and in pursuance of a fraudulent conspiracy between Dippold and Philip Fabel and Kate, his wife, (who were without the means to purchase said lands,) and other persons to the plaintiffs unknown. The defendants in the suit are Philip Fabel and Kate, his wife, and John Dippold and Nannie, his wife. The answers are responsive to the bill, and deny all its allegations of fraud and conspiracy.

The plaintiffs called and examined Philip Fabel and John Dippold "as if under cross-examination," pursuant to the Pennsylvania practice, and they subsequently introduced evidence tending to contradict them. To this mode of procedure no objection was taken before the examiner, but at the final hearing the defendants' counsel objected to the whole of the evidence, and claimed that the bill must be dismissed for want of proof to overthrow the answers. The evidence, however, was read, subject to the objections, and the questions thereby raised were reserved. These objections are—*First*, that the Pennsylvania statute providing for the examination of the opposite party "as if under cross-examination" is not applicable to a suit in equity in a court of the United States; and, *second,* that it was not competent to call Philip Fabel and John Dippold to testify against their wives. (1) The first objection is well taken, and sustained by a recent decision of the United States circuit court for this district, in *Pennsylvania R. Co.* v. *Allegheny Valley R. Co., ante,* 115. But it does not follow that the testimony is to be rejected altogether. Under section 858, U. S. Rev. St., the parties to a suit are admissible to testify for themselves and compellable to testify for the others. *Texas* v. *Chiles,* 21 Wall. 488. Now, to sustain an objection to the mode of conducting an examination which was not raised before the examiner would take the plaintiffs by surprise. The testimony of Fabel and Dippold, therefore, must be received, and such effect given to it as if they had been called generally by the plaintiffs, unless there is something in the second objection. (2) Whether, in view of the Pennsylvania rule which forbids husband and wife to testify against each other, either can testify against the other in a court of the United States sitting in this state, need not be determined here. Mrs. Dippold has no pecuniary interest whatever (so far as appears) in this suit, and she is an unnecessary and improper party. Then as to Mrs. Fabel, while it may be that the testimony of her husband could not be used to her prejudice, certainly he is a competent witness, as against himself, and his interest here is separable from hers. These objections, then, being overruled, we are brought to a consideration of the evidence.

In the year 1876, and for some time prior, John Dippold & Sons were engaged in steam-boating and in merchandising coal. Their business head-quarters were at Pittsburgh, but they transacted some busi-

ness in the same firm name at Louisville, Kentucky. John Dippold resided in Beaver county, Pennsylvania, on the lands now in dispute. Philip Fabel is the son of Frederick Fabel, who died in July, 1878, before this suit was brought. Frederick Fabel carried on the manufactory and business of a chandler in Louisville. He was prosperous and a man of considerable means. It does not very clearly appear what estate he left at his death, but probably it was at least $100,000. Philip had been in his father's employ as book-keeper and clerk, at a yearly salary of $1,200. The relations, business and otherwise, between father and son were confidential and close. The son married Kate Dippold in March, 1874. Philip Fabel and John Dippold both testify that after this marriage, Dippold, whose business frequently called him to Louisville, borrowed from Philip Fabel, from time to time, various sums of money, many of which loans were repaid, but not all, so that in January, 1876, Dippold owed on these loans $10,000. At that time (they say) Dippold applied for a further loan of $10,000, but Philip refused unless he was secured; that, after some negotiations, it was finally agreed that Dippold should sell and convey his real estate in Beaver county, Pennsylvania, to Philip for $28,000,—the sum it had originally cost Dippold, and, it would seem, its then fair value;—Philip, in addition to the $10,000 already loaned, to pay Dippold $10,000 in cash and to give his notes for the other $8,000. Philip (they state) then came to Pittsburgh, and the parties met at the house of J. Sharp McDonald, at Sewickley, where the transaction was consummated; Philip paying to Dippold $10,000 in cash, and giving his four notes at four, six, eight, and twelve months, aggregating $8,000, and receiving the two deeds already mentioned. They testify that a short time afterwards Philip wrote a letter in his father's name to Dippold that he would discount the notes, and thereupon Dippold brought them to Louisville to Fabel's place of business, and Dippold was paid $7,600 for the notes. This is the substance of the testimony of Philip Fabel and John Dippold touching the main transaction. Philip further testifies that all this money he received from his father, and that it came in the first instance out of his business. He states, however, that when he took money out of the safe to loan to Dippold he made a loose temporary memorandum until his father replaced it, and no entries were made on the books. Speaking on this subject, he says:

"When I told him that I had loaned the money, he sold some stocks or something and replaced it. That was the case in every instance of these loans. I reported to my father in each separate instance. I don't know how he replaced it unless he sold stocks. He would replace the money I would report to him. I was the financial son, and what I did was regarded by him as correct."

Philip further testifies that his father told him it was his purpose to keep an account against each child of what he or she got, so that after his death one would not get more than another, but no such ac-

count had been found; and that none of the transactions between himself and John Dippold were entered on the books connected with his father's business. He also states that he took no notes, or writings evidencing the loans. He says that the money he paid Dippold at Sewickley, and which he carried there in his satchel, was in large bills, five or six $1,000 bills, and the rest in bills of $500; and that these bills he procured at Louisville, in exchange for smaller currency, through one J. William Anderson, a broker, who left Louisville and went to Europe a few months afterwards. Philip testifies that he took his deeds to Louisville, and there kept them until December, 1877, when he sent them to J. Sharp McDonald to have them recorded.

The defendants' counsel contend that as this testimony comes from witnesses called by the plaintiffs they are concluded thereby, and its truth cannot be questioned by them. But to such proposition I cannot assent. Where a party is called by the opposite party he stands in a different position from an ordinary witness. He is necessarily hostile to the party calling him, who is not bound by what he testifies. Whart. Ev. §§ 484, 489. It may be that he cannot be directly impeached by the party who called him, but he may be freely contradicted, even though this may incidentally discredit him. But while this is so, on the other hand, a party who has voluntarily put his adversary on the witness stand cannot insist that his testimony shall be ignored if it happen to disappoint him. It is competent testimony in the case, and, unless self-contradictory or inherently improbable, it must prevail in the absence of countervailing evidence. Keeping in mind these principles, let us proceed to consider the evidence, which in the main is circumstantial, relied on by the plaintiffs.

It appears that in January, 1876, John Dippold & Sons were largely indebted. Their then principal creditor was the Tradesmen's National Bank of Pittsburgh, which held $51,000 of their paper. About $26,000 of this debt still remained unpaid when the firm went into bankruptcy, the reduction being accounted for otherwise than by money received from Fabel. It is shown that there was no change in the possession of the lands in question; John Dippold remaining in possession after the conveyances, the same as before. There is evidence that, in a conversation with F. H. Anderson two or three months before his bankruptcy, John Dippold spoke of these lands as his, and that in January, 1878, upon the renewal of a note, he expressly stated to Cyrus Clarke, Jr., cashier of said bank, that the property was all in his name, except a little piece that had some defect in the title, which was in his wife's name, and there was nothing against it. The plaintiffs also show that the name of J. William Anderson was not in the directories of the city of Louisville, and they examined several witnesses who would be likely to know such a broker, who testified that they had never heard of such a person. Upon this evidence, in connection with the relationship between the parties; the fact of conveyances to the grantors' daughter jointly with

her husband; the secrecy of the transaction, and the retention of the deeds from record until the very eve of the proceedings in bankruptcy; the unusual incidents detailed by the parties, such as the use of cash in every instance instead of checks, the bringing of $10,000 to Pittsburgh in a satchel, and the absence of all entries in Frederick Fabel's books; the omission to have the title to the land examined, or to take professional advice; the failure to account specifically with what was done with the money, John Dippold merely stating that he used it in his business and to lift notes, without being able to particularize; and upon the extraordinary character of the transaction generally,—the plaintiffs rely as overthrowing the testimony of Fabel and Dippold that the consideration moneys named in the deeds were actually paid, and as impeaching the *bona fides* of the conveyances.

Certainly the case is an uncommon one, and it must be conceded that it is attended by some circumstances tending to excite suspicion as to the integrity of the transaction. Nevertheless, human affairs are so diverse, and their phases oftentimes so strange; the actions of mankind frequently are so unaccountable,—that we might well pause before rejecting the positive testimony of the plaintiffs' two chief witnesses, even if they stood uncorroborated. That Frederick Fabel had the pecuniary ability to make the alleged advances to his son Philip, if he saw fit to do so, is plain enough, I think, upon the plaintiffs' own showing. His business methods connected with this matter, as indicated by the son's testimony, may appear odd; but we should not be too hasty in drawing conclusions therefrom, in view of the glimpse into his character afforded by what the plaintiffs' witness Jacob Krieger incidentally remarks. Speaking of the elder Fabel, he says: "But some old Germans keep their private matters very close,—especially their money matters,—so strictly private, that it is very hard even for a sharp business man to learn much about them." Again, the very relationship subsisting between John Dippold and Philip Fabel might beget in the latter such confidence in the former as to account satisfactorily for conduct on the part of Philip which, in the case of strangers, dealing naturally at arm's length, would be scarcely reconcilable with good faith.

Beyond the fact of the indebtedness of John Dippold & Sons in January, 1876, and their failure some two years later, we have little evidence as to their financial condition at the earlier date. The books of the firm were not offered in evidence before the examiner, nor exhibited to the court, and they are not in the case. But if financial embarrassment in January, 1876, can be inferred from the proofs, it must still be said that there is not a particle of direct evidence that Philip Fabel was aware of the fact,—at least apart from his knowledge that Dippold was a borrower of money. Philip's own testimony is that he knew nothing about Dippold's affairs; and he lived, it must be remembered, 500 miles from Pittsburgh. Upon the plaintiffs' proofs it would be a strained inference that John Dippold was contemplating bankruptcy

in January, 1876. Indeed, Mr. Clarke's testimony rather suggests that he was then vigorously and hopefully attempting to extricate his firm from debt. Can it be thought surprising that he should seek pecuniary aid from the Fabels? The retention of possession, so much insisted on as a badge of fraud, might well be accounted for on the score of kindly feelings cherished by young Fabel towards his wife's aged parents, even if it were not shown to be consistent with an agreement testified to by John Dippold and J. Sharp McDonald. They state that at Dippold's request Philip Fabel agreed to resell him the lands at the price of $28,000, with interest, if paid within two years, and that a few words to that effect were written on a slip of paper, and signed by Philip, and given to Dippold, who says that he has lost it. It may be proper to say just here that about this particular matter Fabel (who was the first witness examined) was not interrogated at all, and he did not mention it. How Kate Fabel's name came to be inserted in the deeds as one of the grantees is an unexplained circumstance. It seems not to have attracted the special notice of counsel on either side during the taking of the testimony, for no witness was asked in respect to it. That her name should go in the deeds was no part of the prior arrangement, as testified to. The deeds were not drawn by a lawyer, but J. Sharp McDonald took Dippold's old deeds, and therefrom had young Jacob Dippold prepare the deeds to Fabel, using the ordinary printed blank forms. It is possible that Jacob ignorantly supposed that the name of the grantee's wife should be inserted. Philip Fabel, to the inquiry whether he asked why the deeds bore different dates, responded: "I never mentioned it at all. I said nothing. I had Sharp McDonald's word that it was all right, and took my deeds, and paid out my money." It would seem, then, that Philip made no very close scrutiny of the deeds. However, as the matter has been left, whether the wife was made a grantee by a mistake of the scrivener, or by direction of Philip Fabel, is a point about which we can only conjecture. And now as to the recording of the deeds. Under the laws of Pennsylvania a deed takes full effect by mere delivery, and, as against the grantor and one in the situation of a subsequent assignee in bankruptcy, it is immaterial whether it is recorded or not. *Mellon's Appeal,* 32 Pa. St. 121; *Curry* v. *McCauley,* 11 Fed. Rep. 365; S. C. 20 Fed. Rep. 583. Here there is no evidence whatever of any agreement or understanding that the deeds should be withheld from record. That they were not recorded as early as December, 1877, was the fault of McDonald. And if John Dippold made the alleged misrepresentations to Anderson and Clarke, it was not in the presence of Philip Fabel. In fine, the circumstances most insisted on as overcoming the oaths of Fabel and Dippold are so equivocal, and of such doubtful significance, that it would be unsafe, it seems to me, to decree the deeds to be void for the alleged fraud, did the case rest upon the plaintiffs' proofs only.

But the case does not so stand. The defendants have introduced

testimony of the utmost importance and value to them. In the first place, the testimony of Frank W. Smith, the notary public, puts it beyond any question that the deeds were in fact executed more than two years before the bankruptcy, on the date set forth in the acknowledgments, January 26, 1876. And then J. Sharp McDonald testifies that shortly prior to that date, at the instance of John Dippold and in his behalf, he visited Louisville and concluded the negotiations with Philip Fabel for the sale of the lands to him upon the aforesaid terms. He then understood, from both Dippold and Fabel, that the former owed the latter $10,000 for moneys loaned. The bargain being finally agreed on, McDonald returned to Pittsburgh and reported to Dippold, and the deeds were prepared and executed in anticipation of Fabel's arrival. The transaction was closed in McDonald's house, and in his presence. He drew the notes for $8,000, and saw Fabel make the cash payment of $10,000, and give his notes to Dippold, and the deeds delivered to Fabel. True, McDonald states that he did not count the money, but he saw Dippold count it, and he is morally certain that the amount was $10,000. McDonald's first wife, who was dead at this time, was a daughter of John Dippold, and at a later date he became a partner with Dippold in the firm of Dippold & McDonald; but these facts do not tend to his discredit. He has no apparent interest in this case, and there is no discernible reason for his swearing falsely. I have attentively looked into the evidence, and am unable to discover a substantial basis for the theory that McDonald himself was a party to the alleged conspiracy. There is still less ground for the hypothesis that he was hoodwinked. And accepting, as I think we must, his narrative as true, it is strongly confirmatory of the testimony of Fabel and Dippold, and goes far to sustain the conveyances in question.

It may be that I have failed to mention some matters which impressed the learned counsel for the plaintiffs more than they have me; but this opinion has grown to such length that I almost forbear further discussion, and I can only add that a careful study of the whole case has brought me to the fixed conclusion that the clear weight of evidence is on the side of the defense, and that the bill should be dismissed.

Let a decree be drawn dismissing the bill, with costs to be paid out of the estate in bankruptcy.