### UNITED STATES v. BARBER LUMBER CO. et al.

(Circuit Court, D. Idaho. September 7, 1909.)

#### No. 47.

1. PUBLIC LANDS (§ 120*) — CANCELLATION OF PATENTS — SUIT BY UNITED STATES.

In a suit by the United States to cancel patents to land for fraud, the bill must allege specifically and in detail in what the fraud consists, and the complainant can recover only on the case so made, and the allegations must be established affirmatively by clear and convincing proof.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 335; Dec. Dig. § 120.*]

2. EVIDENCE (§ 591*)—OBJECTIONS BY PARTY INTRODUCING EVIDENCE.

A party who introduced witnesses, while not bound by their testimony, cannot insist that they are unworthy of belief, and, unless their testimony is self-contradictory or inherently improbable, it cannot be disregarded.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2440; Dec. Dig. § 591.*]

3. PUBLIC LANDS (§ 139*)—TIMBER AND STONE ENTRIES—LEGALITY.

An applicant for the purchase of land under the timber and stone act (Act June 3, 1878, c. 151, 20 Stat. 89 [U. S. Comp. St. 1901, p. 1545]), as amended, has the right after he has made his initial application and before final proof to contract to sell the title thereafter to be acquired, and the intending purchaser may lawfully advance to him the money with which to make final proof in order that he may comply with his contract.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 369–374; Dec. Dig. § 139.*]

4. PUBLIC LANDS (§ 120*)—CANCELLATION OF PATENTS—SUIT BY UNITED STATES—SUFFICIENCY OF EVIDENCE.

The fact that a defendant purchased a large tract of timber lands substantially in a body from persons who had entered the same under the timber and stone act shortly after their entry is not sufficient to establish the fraudulent character of the entries, and entitle the United States to a cancellation of the patents, even though some of the entrymen knew that defendant was buying or desired to buy timber land in the vicinity, and made their entries with the expectation of selling to defendant at an advance over the government price, where there were no relations between the parties prior to the entries and no agreement or understanding direct or implied for the sale of the lands.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 332–335; Dec. Dig. § 120.*]

In Equity. On final hearing.
See, also, 169 Fed. 184.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Peyton Gordon and Charles A. Keigwin, Special Assistants to the Attorney General, for the United States.

C. T. Bundy and A. A. Fraser, for defendants.

BEAN, District Judge. This is a suit brought by the government against the Barber Lumber Company, a corporation, and others, to cancel and set aside 210 patents for lands in the state of Idaho, issued by the complainant to that number of entrymen and entrywomen under the timber and stone act (Act June 3, 1878, c. 151, 20 Stat. 89 [U. S. Comp. St. 1901, p. 1545]), the title to the lands described in such patents having by proper conveyances vested in the defendant corporation.

The complainant charges, in substance: That the defendant, the Barber Lumber Company and its codefendants, intending to defraud the complainant out of large tracts of valuable public lands, did combine, conspire, and agree to and with Frank Steunenberg, now deceased, and one John I. Wells, and with other parties not necessary to be named, to fraudulently procure for themselves and for their use and benefit and pecuniary advantage large quantities of public lands by procuring certain named persons to avail themselves of the provisions of the timber and stone act by filing written statements and doing the other things required by said act, and the regulations of the Commissioner of the General Land Office, under an agreement then and there and theretofore had and entered into, wherein, and whereby the said company and its codefendants agreed to purchase the lands described in the respective statements and applications of the applicants as soon as they should secure title thereto, they agreeing to furnish or procure to be furnished and supplied to the applicants the amount of money necessary to pay all expenses in connection with making the filings and procuring title, including the sum necessary to pay for the land. That in pursuance of this unlawful and corrupt conspiracy and agreement, and to carry out and effect the object and purposes thereof, the defendant the Barber Lumber Company and its codefendants, together with Steunenberg and Wells, did unlawfully, falsely, fraudulently, and corruptly induce and procure divers named persons to apply at the United States Land Office at Boise, Idaho, for lands under the provisions of the act of Congress referred to, and did cause, induce, and procure such parties, and each of them, to appear before the register or receiver of the Land Office, and each to make and subscribe an oath to the written statement required by the act of Congress of persons desiring to avail themselves of the provisions thereof, in substance, that he did not apply to purchase the land described in his statement on speculation, but in good faith to appropriate it to his own exclusive use and benefit, and that he had not, directly or indirectly, made any agreement or contract with any person or persons whomsoever by which the title which he might acquire might inure in whole or in part to the benefit of any person except himself; that the statement so made by each of the applicants was false, fraudulent, and untrue, and made for the purpose of procuring title from the United States to the lands described in the several sworn statements to the

persons named, pursuant to the unlawful, false, fraudulent, and corrupt conspiracy, combination, and agreement referred to. That; in truth and in fact, divers of the several applicants had been supplied and furnished the money with which to pay for the lands, and the fees and expenses incident to obtaining title thereto, by the Barber Lumber Company and its codefendants pursuant to such unlawful combination and conspiracy. That thereafter the Barber Lumber Company and its codefendants, by reason of such unlawful, corrupt, and fraudulent schemes and practices, and by and through the various persons named in the bill as employed by them for that purpose, fraudulently obtained and procured the patents of the complainant to be issued to the various named persons, and that such patents were not procured in compliance with the laws of the United States, but were illegal, fraudulent, and void as against the complainant, and contrary to equity and good conscience.

The Barber Lumber Company alone answered, denying the fraud charged in the bill, and pleading affirmatively that it purchased the lands in controversy from the several entrymen and entrywomen in good faith for a valuable consideration, and without notice or knowledge of illegality in the method of procuring title from the government, if any such existed. Upon the issues thus joined, the case was referred to a master to take testimony, and, upon his report, the case has been tried and submitted.

The suit is brought to set aside land patents issued by the government on the ground of fraud. The bill of complaint sets forth in detail the acts constituting the alleged fraud, which consist substantially in an averment that, while the lands in question were entered ostensibly in the names of the several entrymen and entrywomen, they were in reality entered for the use and benefit of the Barber Lumber Company, and under a corrupt and illegal agreement between such entrymen and entrywomen and the company made prior to the time the respective applications for the purchase of the land were filed in the local land office, and that the affidavits attached to each of said applications, and the oath of each applicant made at the time of his application that he did not apply to purchase the land on speculation, but in good faith to appropriate it to his own exclusive use and benefit, and that he had not directly or indirectly made any agreement or contract in any way or manner with any person or persons whomsoever, by which the title which he might acquire should inure in whole or in part to the benefit of any person except himself, were false and untrue. Upon this averment complainant must recover, if at all. In a suit of this character the bill must show specifically and in detail in what the fraud consists and how it was effected, and, although the complainant may make out a case which, under other circumstances, would entitle it to the aid of the court, yet, if it is not the case made by the bill, it cannot recover. Southall v. Farish, 85 Va. 403, 7 S. E. 534, 1 L. R. A. 641; Kent's Adm'r v. Kent's Adm'r, 82 Va. 205; Lewis Pub. Co. v. Wyman (C. C.) 168 Fed. 756. With this understanding of the issues and the rule of law governing the proof thereunder we can proceed to a consideration of the facts.

The evidence is voluminous, consisting of between 4,000 and 5,000 pages of closely typewritten matter, together with a large number of exhibits, and in the nature of things it is impossible to note it in detail, or the various inferences or conclusions drawn therefrom. I can do nothing more than state briefly my conclusions, after a careful consideration of the record, aided materially, as I have been, by the able and exhaustive arguments and briefs of counsel. A large part of the testimony was taken over the objection of the defendant that it was immaterial, irrelevant, and incompetent, and these objections were renewed on the trial by a motion to strike out. It is not necessary, however, to consider the objections at this time, for the reason that, whether the testimony is competent or not, it does not affect the conclusions to which I have arrived. The lands involved, because of their locality and the time and circumstances under which the title was acquired from the government, are naturally divided into three classes, and have been so considered throughout the trial, although not so designated in the bill, viz., 92 entries in the Boise Basin, and known as the "Basin Lands," a like number of entries in the Crooked river country, some distance east of the Basin and known as the "Crooked River Lands," and 26 entries in township 6, 4 E., known as the "6–4 lands." The Basin lands were all open to entry prior to the year 1898, but no entries were made therein until the year 1901. During the late summer or early autumn of that year Parrish & Manning, a Minnesota firm, advertised in the Minneapolis papers that they were able to and would show persons desiring to purchase lands under the timber and stone act valuable tracts of lands in the Boise Basin, in the state of Idaho, for a consideration of $135 paid by each, which was to include the cost of transportation from Minnesota to the lands. In pursuance of this advertisement, and under an arrangement with Parrish & Manning, five or six people came from Minnesota to Idaho with the intention of taking land under the timber and stone act. Among the number were Patrick H. Downs and a man by the name of Snow. Downs and Snow were somewhat familiar with timber, acquainted with the government surveys, and capable of estimating the timber on a given tract of land, and tracing out the boundary lines thereof. After they arrived in Idaho, they worked five or six weeks for Parrish & Manning in cruising the lands in the Boise Basin, and thus familiarized themselves with the quantity and quality of the timber thereon, and with the location of the several tracts. Parrish & Manning's scheme, however, proved unsuccessful, and was abandoned early in the fall of 1901, but, either on account of the notoriety which it had given to the Boise Basin, or because of a local railroad enterprise headed in that direction, or the unaccountable desire to acquire title to public lands which sometimes possesses a community without any apparent reason, or for some other cause, a sudden demand seems to have arisen for timber land in that vicinity by persons desiring to purchase the same under the timber and stone act, and Downs and Snow conceived the idea of engaging in selling the information they then possessed or might thereafter acquire to such persons. Snow, however, soon returned to Minnesota, and Downs formed a partnership with John I. Wells, a resident of the Basin country. Under the arrangement be-

tween them Wells was to move to Boise City, some 40 or 50 miles distant from the land, and there receive applications from persons desiring to enter the same, and send such applicants up to Downs, who was to show them the various tracts, for which they were to charge the applicant a fee of $25, to be divided equally between them. In pursuance of this agreement, about 75 applications were made by persons who were shown the lands by Downs and Wells up to January 1, 1902, about 20 of whom had tendered their final proof. No final certificates, however, had been issued in any of these cases, because prior to the filing of the applications a general order of the Land Department suspending the right of the officers of the local land office to issue such certificates on timber and stone entries, and requiring the final proof in all such cases to be sent to Washington for examination there, had been issued. As the time for final proof approached, several of the applicants found themselves without means with which to pay for the land, and about the 1st of January, 1902, Wells arranged with William Sweet, a resident of the Basin, to furnish to such of them as might need it the necessary money with which to make such payments, and from 18 to 20 of the applicants making final proof after the 1st of January were supplied with money by Sweet through Wells. Soon after agreeing with Wells to furnish this money, Sweet conceived the idea of purchasing and assembling as large a tract of this land as possible in one holding, and for that purpose employed defendant John Kinkaid, formerly a resident of the Basin, to purchase the lands for him from the applicants, but Kinkaid did not do so because final certificates had not been issued, and as he understood the law, and as it was then interpreted by the Land Department and generally understood by the profession, it was illegal and unlawful for an applicant under the timber and stone act to sell or contract to sell his land prior to the issuance of the final receipt.

In February, 1902, Ex-Governor Steunenberg of Idaho became interested with Mr. Sweet in this venture, purchasing or contracting to purchase a one-half interest therein, and by the 1st of March he and Sweet had acquired control of about 6,400 acres, and Steunenberg began to look about for some person or persons with capital sufficient to acquire the title to the lands held by himself and Sweet, purchase other lands in the vicinity, and otherwise handle the enterprise. To that end he submitted the matter to A. B. Campbell of Spokane, but Mr. Campbell, not desiring to engage in the timber business, referred him to A. E. Palmer of that city, who had formerly been in the employ of the Northwestern Lumber Company of Wisconsin, in which the defendants Barber and Moon were largely interested and the principal officers, and who had been requested by Mr. Barber to report to him any prospective timber deal which looked promising. On February 21, 1902, Palmer wrote to Barber and Moon at Eau Claire, Wis., advising them of Steunenberg's proposition, and recommending its consideration by them. This was the first information either Barber or Moon had concerning the lands in question, or that there were any timber lands in Boise Basin. After several letters and telegrams had passed between Palmer and Barber in reference to the matter, Barber wired for Steunenberg to come to Eau Claire. Steunenberg arrived

in Eau Claire on March 6th, and had an interview with Barber and Moon, in which he represented to them that he and Sweet had become interested in some land titles in the Boise Basin in the state of Idaho; that they had purchased or acquired about 6,400 acres, for which they had final receipts, but had taken no deeds because patents had not issued, and that they were holding back part of the purchase money until patents should be issued; that there were from 4,500 to 5,000 acres more in the same locality for which applications had been made and upon which final proof would soon be made, and he was confident that it could be purchased when it came on the market at not to exceed $5 an acre, and that enough more land could be secured in the same vicinity by the use of lieu land scrip to make a total of 25,000 acres; that Sweet was not able or willing to finance the matter any further, but would sell out at a profit of 50 per cent. on his present investment, and requested Barber and Moon to buy Sweet out, furnish the money with which to purchase the other claims when they should come on the market, and to buy scrip with which to secure an additional amount of land necessary to make the aggregate of 25,000 acres.

After considerable negotiation between Barber and Moon and Steunenberg, a written contract was finally prepared and signed by Barber and Moon on the 12th of March, 1902, in which it was stipulated and agreed that in the event they should purchase and acquire the interest of Sweet in the lands in question, and pay him therefor the amount of his actual investment, together with an additional 50 per cent., that Steunenberg could and would procure by good and perfect title and vest in them within six months from the date thereof 25,000 acres of land with at least 200,000,000 feet, board measure, of merchantable pine and fir timber standing and growing thereon, in substantially compact form, along and adjoining Grimes and Moores creeks in what is known as Boise Basin, in the southern part of Boise county, Idaho, and so situated as to be valuable for manufacturing into lumber, the total cost thereof not to exceed in the aggregate the sum of $140,000. In consideration of this stipulation on the part of Steunenberg, Barber and Moon agreed that they would pay to Sweet the amount of money actually expended by him in assembling such lands, with 50 per cent. added, and that they would, from time to time and when required, advance the necessary funds to purchase government scrip with which to obtain title to other lands, and to acquire title from persons other than the United States, provided that no funds should be advanced except for actual investment in lands and obtaining title thereto in the name of Barber and Moon. It was further stipulated that, when the title should be vested in Barber and Moon to 25,000 acres under the contract, they might, at their option, cause a corporation to be organized under the laws of the state of Wisconsin with a capital stock equal to the investment made in acquiring title thereto, and cause all such lands to be conveyed to such corporation. But, in the event that title to 25,000 acres should not be vested in Barber and Moon within six months from the date of the contract, they were to be at liberty to sell and dispose of all the lands acquired by them in pursuance thereof after giving Steunenberg six months' notice of their intention to do so, and retain out of the moneys so received the whole

amount which they might have advanced under the contract. This agreement was not to become effective until Steunenberg's statements and representations about the land and the investment of Sweet therein should be verified by Mr. Palmer, who was to act as the agent and representative of Barber and Moon.

On the day the contract was signed by Barber and Moon at Eau Claire, Mr. Barber left for the South on his vacation, and on the next day Mr. Moon forwarded a copy of the contract, together with a letter of instructions, to Palmer, and requested Palmer to proceed to Boise as soon as convenient to examine into the matter, and to close with Steunenberg if he found the conditions as represented. In pursuance of this understanding and agreement, Palmer went to Boise the last of March or the 1st of April, and, after an investigation, closed the contract with Steunenberg on the 10th of April, paying him for himself and Sweet about $40,000. This was the first connection that Barber and Moon, or either of them, had with the Basin entries. At that time all of such entries involved in this suit had been made except about 18, but no final certificates had been issued because of the order referred to, although that fact was not known by nor communicated to Barber and Moon. There is no evidence whatever in the record that any of the entries were made at the instigation of or in the interest of Barber and Moon, or the Barber Lumber Company, which was subsequently organized by them on the 20th of the following July. None of these entrymen were the agents or employés of Barber and Moon, nor were Barber or Moon acquainted with them, nor had they ever heard of the land in Boise Basin or its condition until advised by Palmer of Steunenberg's proposition in February, 1902, and their subsequent interview with him about the 1st of the following March. Forty-nine of the 92 entrymen and entrywomen whose applications are involved in this controversy were witnesses in the case. They all testified that their applications were made by them for their own use and benefit, and not under any contract or agreement with Barber and Moon, or the Barber Lumber Company, or any other person, by which the title to the land which they might acquire would inure to their benefit. The order suspending the action of the local land office was vacated in June, 1902, and final certificates began to issue. Immediately thereafter Steunenberg commenced taking deeds from the applicants in order to comply with his contract with Barber and Moon. For that purpose, he employed the defendant Kinkaid, who, in turn, engaged the services of defendant Pritchard to assist him; Steunenberg agreeing to allow Kinkaid $800 for each claim he could purchase. Upon the delivery of the deeds and final receipts by Kinkaid, Steunenberg paid him the amount due the several applicants, drawing on Barber and Moon therefor. It would seem from this testimony, and it is undisputed, that the averment of the bill that the entries were made ostensibly in the name of the applicants, but in reality for the Barber Lumber Company, is wholly unsupported by the testimony.

It is argued on behalf of the government that because there is some evidence tending to show that the pecuniary condition and financial ability of many of the applicants and of Downs and Wells, the locators, were such as to render them unable to provide the money nec-

essary to make final proof, there must have been some powerful financial influence back of the movement, and the applications must have been thus induced; and, since thereafter the Barber Lumber Company acquired title to the lands, it must be assumed as conclusive, in the absence of evidence as to the supposed interest back of the movement, that it was the promoters of that company. But a patent of the United States for land, regularly issued and signed by the proper officers of the government, cannot be avoided or set aside on mere conjecture or suspicion. The fraud charged in the bill in a suit for that purpose must be established by clear and convincing proof. In the Maxwell Land Grant Case, 121 U. S. 325, 7 Sup. Ct. 1015, 30 L. Ed. 949, the Supreme Court takes occasion, in view of the importance of the question and the number of cases then coming before the court, instituted by the Attorney General to set aside patents, to announce with some particularity the rule as to the nature of the testimony and the circumstances which will justify a decree in favor of the complainant in such a suit. It is there said:

"The deliberate action of the tribunals, to which the law commits the determination of all preliminary questions and the control of the progress by which this evidence of title is issued to the grantee, demands that to annul such an instrument and destroy the title claimed under it the facts on which this action is asked for must be clearly established by evidence entirely satisfactory to the court, and that the case itself must be within the class of causes for which such instrument may be avoided. * * * We take the general doctrine to be that, when in a court of equity it is proposed to set aside, to annul, or to correct a written instrument for fraud or mistake in the execution of the instrument itself, the testimony on which this is done must be clear, unequivocal, and convincing, and that it cannot be done upon a bare preponderance of evidence which leaves the issue in doubt. If the proposition, as thus laid down in the cases cited, is sound in regard to the ordinary contracts of private individuals, how much more should it be observed where the attempt is to annul the grants, the patents, and other solemn evidences of title emanating from the government of the United States under its official seal. In this class of cases, the respect due to a patent, the presumptions that all the preceding steps required by the law have been observed before its issue, the immense importance and necessity of the stability of titles dependent upon these official instruments demand that the efforts to set them aside, to annul them, or to correct mistakes in them should only be successful when the allegations on which this is attempted are clearly stated and fully sustained by proof. It is not to be admitted that the titles by which so much property in this country and so many rights are held purporting to emanate from the authoritative action of the officers of the government, and, as in this case, under the seal and signature of the President of the United States himself, shall be dependent upon the hazard of successful resistance to the whims and caprices of every person who chooses to attack them in a court of justice; but it should be well understood that only that class of evidence which commands respect, and that amount of it which produces conviction, shall make such an attempt successful."

This doctrine has been followed and approved by the Supreme Court in many subsequent cases. Colorado C. & I. Co. v. U. S., 123 U. S. 307, 8 Sup. Ct. 131, 31 L. Ed. 182; U. S. v. Budd, 144 U. S. 154, 12 Sup. Ct. 575, 36 L. Ed. 384; U. S. v. Stinson, 197 U. S. 204, 25 Sup. Ct. 426, 49 L. Ed. 724.

It was therefore not incumbent upon the answering defendant to explain any of the suspicions or inferences as to the influence behind the original movement in the location of the land in the Boise Basin,

if. there was any improper influence, a fact not deducible from any testimony in this case except the merest inference. It is just as reasonable and certainly more just to suppose that the entrymen and entrywomen in making the applications to purchase acted, as they each testified, honestly and in good faith, than it is to conjure up some contrary theory, which necessarily assumes that all the witnesses in this case upon that question perjured themselves on the trial. Patents have been regularly issued for all of these lands, and the defendant has purchased and paid for them at the rate of at least $800 per claim, and the burden of proof is on the government to show that the patents which it has issued were procured by fraud before such patents can be avoided. Mere inference, conjecture, or suspicion is not enough.

The next in order are the Crooked river lands. The acquisition of title in this section of the country was not in contemplation by either Barber or Moon or Steunenberg at the time the contract of March, 1902, was entered into between them. It was supposed at that time that the investment would be confined to the Boise Basin. During the fall and winter of 1901, while Downs and Wells were engaged in locating people in the Basin, Downs learned that there was probably valuable timber land in the Crooked river country, and it was arranged between himself and Wells that he should investigate that country the following spring after the snow had disappeared, which he did, and ascertained that there was a considerable body of valuable timber land in that section. No applications to purchase here were made under the timber and stone act until the last of August, 1902. About that time Barber and Carson, who was interested with him as a stockholder in the Barber Lumber Company, visited Boise to look after their interests in that section, and while there were advised by Steunenberg that there was a large body of land in the Crooked river country which could be secured by the use of lieu land scrip. Steunenberg was then instructed by them to send an estimator into that country to examine and estimate the timber for the purpose of ascertaining whether it was of sufficient value and in sufficient quantity to justify them in securing title thereto by the use of scrip. About the time of this visit and the instructions to Steunenberg to have the Crooked River country investigated, Downs and Wells, no doubt with knowledge of that fact, began actively locating residents of Boise City and vicinity in that section of the country under the timber and stone act, charging and collecting from each applicant a fee of $25, and from the 27th of August to the 18th of October 79 claims were so located. About the 1st of October Steunenberg employed a man by the name of Taylor, and sent him into the Crooked river country for the purpose of investigating and estimating the quantity of timber, in pursuance of instructions given the previous August by Barber and Carson. Taylor learned from the residents that a large part of the land had already been filed on by applicants under the timber and stone act, and upon his return so reported to Steunenberg. In December, 1902, Steunenberg wired Barber and Moon, at Eau Claire, Wis., that he was going East with important information with reference to the Crooked river lands. Upon his arrival at Eau Claire, he advised them of the situa-

tion, and that it would not be possible to acquire the land by the use of the scrip because of these applications, and was instructed by Barber and Moon to have the lands examined, and if the timber was found satisfactory, to purchase them if he could do so at not to exceed $1,000 a claim after final proofs were made and they came on the market. After these filings were made, the defendant Kinkaid secured control of them and was offering them for sale. Steunenberg, in pursuance of his instructions from Barber and Moon, entered into negotiations with Kinkaid for their purchase and finally succeeded in February, 1903, in making a contract to take them at a price of $950 for each claim, and Steunenberg drew on the Barber Lumber Company for $20,000, which was the first money furnished by the company for this purpose. Twenty-nine or 30 additional applications were filed in the land office after this date, and were subsequently purchased by the company through Steunenberg. It is charged in the bill, and argued on behalf of the government, that all of these entries were made by the entrymen ostensibly in the names of the entrymen and entrywomen, but in reality for the use and benefit of the Barber Lumber Company, and with the intention on its part to evade the provisions of the timber and stone act. Except the mere inferences to be drawn from the fact that the company was willing and perhaps anxious to obtain lands in that district, and that it did subsequently acquire title to all these lands, there is no evidence to support the averments of the bill. On the contrary, all the testimony negatives any such a conclusion. Many of the entrymen and entrywomen were called as witnesses in this case. Each and every one of them testified unequivocally and directly that the averments of the bill, so far as he or she was concerned, were false, and that there was no understanding or agreement by which the title to the land should inure to the benefit of any person other than the applicant, and that he or she had made no agreement directly or indirectly with any person to that effect. Thirty-four of them testified that they did not know at the time of their filing of any market for the lands. Some of the others said that they had been told that the land could be sold, but that they did not know who the purchaser was to be. Now, in the face of this testimony, which stands here on the record uncontradicted, the court would not be justified in finding the allegations of the bill to be true. It is to my mind more reasonable to suppose that Downs and Wells, and perhaps Kinkaid, having learned or suspected that the Barber Lumber Company was contemplating acquiring title to the land by the use of scrip, conceived the idea of frustrating this plan and earning some money for themselves from persons desiring to purchase land under the timber and stone act than to suppose the applications were made in pursuance of an unlawful and corrupt agreement between the applicants and the defendants.

"6-4 Lands": The plat of the 6-4 lands was not filed in the local land office until July 15, 1903. Some time previous to that date the defendant Moon visited Idaho to examine the property owned by his company with a view of determining whether it was sufficient to justify the putting in of a manufacturing plant. While there he noticed some of the timber on what subsequently became township 6-4, and directed Mr. Connor, an estimator in the service of the company, to

examine the land and to estimate the amount of timber thereon. with a view of using lieu land scrip if the timber was of sufficient value. A few days before the plat of the land was filed in the land office, Barber telegraphed Steunenberg not to neglect 6–4. The state, however, had 60 days after the plat was filed in which to exercise its right to select land in such township, and, until its rights were exercised or waived, no other entries or selections could be made. Pending the matter, the attorney for the Barber Lumber Company called at the executive office in Boise to ascertain whether the state intended to exercise its right of selection, and was informed by the Governor that it did. He thereupon suggested to the Governor that the state waive its right, or, if not, to reduce the quantity of land which it contemplated taking. During all of this time the evidence showed that Steunenberg, as the representative of the Barber Lumber Company, was making preparation to file lieu land scrip then owned by the company on land within this township. For that purpose he employed an attorney to prepare the necessary papers, but, as this scrip was in the name of Mr. Moon, some delay and difficulty was encountered in obtaining the necessary power of attorney from him. In the meantime, and before the land became open to entry, and before the scrip could be used, Downs hired Kinkaid to ascertain from the state land office the description of the lands which the state proposed to select, and Kinkaid did so a few days before the land was open to entry. As soon as Downs secured the information, he immediately took a large number of persons who had applied to him to secure land under the timber and stone act into the township, and they selected all of the valuable land therein which had not been previously selected by the state, and each of the applicants paid Downs $25 for his services and the information. In order that there might be no confusion or mistake in the applications, as it was important that they should be correct in order to fustrate the purpose of the Barber Lumber Company to take the land with lieu land scrip, Downs advised intending applicants to secure the services of Kinkaid in preparing the papers, which most of them did, and on Saturday before the opening of the township on Monday these applicants began to assemble at the local land office and remained there in line until the opening of the office Monday morning, when there were 30 persons in line, and their applications were duly received and filed. Some of these persons were advised to enter the land by Kinkaid and some by Downs, but many of them acted upon their own initiative. Twenty of the entrymen testified as witnesses in this case, and each and every one of them swore positively and unequivocally that the entry was made for his own use and benefit, and not that of any one else; that all of them paid a location fee of $25, and, in addition, the expenses of visiting and examining the land, the land office fees, and all of the other expenses in the matter, and that all but two or three paid for the lands from their own funds, and they borrowed the money from Kinkaid. There is no evidence that this money was furnished by or was the property of the Barber Lumber Company, but, if it had been, it would not invalidate the entries unless they were made originally for the Barber Lumber Company, or under a contract or agreement, express or implied, between it and the

entrymen or entrywomen that the title acquired should inure to the benefit of the company. There would have been no illegality nor fraud in the entrymen or entrywomen subsequently contracting to sell the land to the company prior to the issuance of patent, and the company advancing the necessary money with which to make final proof to enable the entrymen and entrywomen to comply with such contract. It is probably true that some of the applicants for these 6–4 lands knew that the Barber Lumber Company was or had been buying lands in that vicinity, and it may be that they expected that they would be able to sell their land to such company in case they should later conclude to dispose of it; but there is no testimony showing that there was any such agreement or arrangement prior to the time the applications were made. Indeed, it would be passing strange that the Barber Lumber Company should make such an arrangement or agreement, for at that time it was the owner of at least 6,000 acres of lieu land scrip costing $5.35 an acre which it could have used and obtained title to the land in a lawful and legal way. It is incredible, therefore, to believe that it would resort to a fraudulent or unlawful scheme of acquiring title through dummy applications at a cost and expense to itself greater than it would have cost it to have acquired the lands by the use of scrip in a legal and lawful manner.

Some stress is laid by the complainant on the fact that prior to the time this land became open to purchase the attorney for the defendant manifested some solicitude that the state should waive its right to make selection in the township, and from that fact the inference is sought to be drawn that there was some corrupt and unlawful understanding on the part of the company to acquire this property in an unlawful manner, through dummy applications, but the inference is not justified by the facts. It is far more probable that the purpose of the company was to acquire title to the land by the use of lieu land scrip than to suppose that it intended to resort to the unlawful and hazardous means of securing it in the manner suggested.

Reliance is also had upon the statement of the witness Horsley that a few days prior to the date the land became open to entry Mr. Barber gave him at Eau Claire, Wis., a book purporting to contain a record of the holdings of the Barber Company in Idaho, and in which book the lands subsequently acquired by the company in 6–4 were noted. Horsley was employed by the Barber Company about the middle of September, 1903, to go to Idaho and take charge of its logging operations. He testifies that, before he left Wisconsin, Mr. Barber gave him a book containing a record of the holdings of the company in Idaho. Upon the trial of this suit, he said that the checkmarks in the book in township 6–4 were not in it at the time it was given to him by Mr. Barber in Wisconsin, and there is other testimony showing that the statement is true. It seems, however, that on some previous occasion, either in a statement to some government official or as a witness on some previous trial, Horsley stated that the book as then produced, and which contained the entry of the 6–4 lands belonging to the Barber Company, was in the same condition as it was in when it was delivered to him by Mr. Barber in September, 1903, and before there were any entries whatever in this township. Horsley as a witness in

this case explains, or attempts to explain, the previous statement in reference to this matter, and gives an apparently reasonable explanation thereof. But, whether this explanation is to be regarded as satisfactory or not, the previous statements made by him are not testimony in this case. They were competent only, if at all, for the purpose of impeachment, and not as substantive evidence.

Again attention is called to a letter from Mr. Barber to George S. Long, dated November 13, 1903, in which he asks Long's permission to have deeds for lands which the Barber Lumber Company was about to acquire put in Long's name. This was before final proof had been made in the 6–4 entries. After such proof and the purchase of these entries by the Barber Company, title was in fact taken in the name of Long, and it is argued that the letter to him was evidence of a previous agreement with the entrymen, but the fact, if it is a fact, that the Barber Company made an arrangement with Long before the final proof in these entries had been made, and, if this be taken as evidence of an existing agreement had at that time between the company and some of the entrymen by which the company was to purchase the land after final proof, it is no evidence tending to support the averments of the bill, and is not proof of fraud. One who has located a tract of land under the timber and stone act is at liberty to sell his title as freely as he may sell any other property he has lawfully acquired. "The act does not," says the Supreme Court in U. S. v. Budd, 144 U. S. 154, 12 Sup. Ct. 575, 36 L. Ed. 384, "in any respect limit the dominion which the purchaser has over the land after its purchase from the government, or restrict in the slightest his power of alienation. All that it denounces is a prior agreement, the acting for another in the purchase. If when the title passes from the government no one save the purchaser has any claim upon it or any contract or agreement for it the act is satisfied. Montgomery [the purchaser] might rightfully go or send into that vicinity and make known generally, or to individuals a willingness to buy timber land at a price in excess of that which it would cost to obtain it from the government; and any person knowing of that offer might rightfully go to the land office and make application and purchase a timber tract from the government." Indeed, under later decisions, an applicant for the purchase of timber lands has a right after he has made his initial application, and before final proof, to contract to sell the title thereafter to be acquired, and the intending purchaser may lawfully advance to him the money with which to make final proof in order that he may comply with his contract. Williamson v. U. S., 207 U. S. 425, 28 Sup. Ct. 163, 52 L. Ed. 278; U. S. v. Biggs, 211 U. S. 507, 29 Sup. Ct. 181, 53 L. Ed. 305.

It therefore seems lawful, under the timber and stone act: (1) One desiring to acquire title to timber land may make known his willingness to buy the same at an advance over the government price. (2) Another person knowing of that fact may make entry with the expectation of selling to such intending purchaser. (3) The entryman may, at any time after his application, sell or contract to sell to the other. (4) The transaction is not denounced by the statute or illegal or unlawful, if there has been nothing further in the way of communication or contract or agreement between the parties than as here stated. Now,

the evidence in this case does not show as intimate connection between the entrymen and the defendant company as the courts have thus approved. There is no evidence that the Barber Company or any one representing or acting for it ever at any time signified a willingness or desire to purchase lands in either the Crooked river or the 6–4 districts at an advance over the government price, or at all, except by the use of lieu land scrip. Nor is there any testimony that any of the applicants intended or expected at the time their initial applications were filed to sell or dispose of their lands to the Barber Lumber Company. It is, I think, probable that there was a general understanding among the entrymen and entrywomen, not put into words perhaps, but nevertheless existing, that they would take the land, and it would subsequently be assembled into one large body and sold at a uniform price to some subsequent purchaser, but there is no evidence that they had any particular purchaser in view, nor that the Barber Lumber Company was regarded as the probable purchaser, nor that it had any intention of acquiring title to the lands by means of applications under the timber and stone act, nor that any of these entries were made by its procurement or solicitation, nor under any contract or agreement with it, express or implied.

In this case, the government grounds its right to recovery upon the averment that the entrymen and entrywomen did not make application for the land in good faith for their own use and benefit, but, on the contrary, entered such land for the benefit and under an agreement with the answering defendant. All or substantially all of the entrymen and entrywomen were residents of the state of Idaho, and most of them of the city of Boise. One hundred and thirty of them were called as witnesses, and each and every one of them testified that the averments of the complaint and the charges made by the government therein are untrue as far as he or she was concerned. Messrs. Barber and Moon, the promoters and organizers of the Barber Lumber Company, and through whose efforts the land was purchased, testified to the same effect, and that neither Wells, Downs, Kinkaid, nor any of the other defendants or entrymen or entrywomen were the agents or employés of the company, or represented it in any of the transactions referred to in this case. Wells and Downs, who showed the applicants the lands located upon by each of them, both testified that they had no understanding or agreement whatever with the applicants as to what should be done with the land, and that they had no interest in the matter except to obtain the location fees; that they were not employed by nor in the service of Barber and Moon, or the Barber Lumber Company, or any of their agents or employés, but were acting for themselves alone, and such was the testimony of Kinkaid and Pritchard as to their connection with the matter. All of this evidence stands uncontradicted except by mere inference or conjecture.

It is insisted that the entrymen and entrywomen who have testified in this case, although called as witnesses by the government, were hostile to it, and that their testimony should therefore be disregarded or viewed with suspicion, but there was no particular hostility manifested by any of these witnesses, unless it is due to the fact that their

testimony does not support the averments of the bill. The government was, of course, not concluded by their testimony, but it cannot insist that they are unworthy of belief or that their testimony should be entirely disregarded and the facts found by the court to be contrary to what these people have testified to without some evidence upon which to base such a conclusion. The testimony was competent, and, unless self-contradictory or inherently improbable, it must necessarily prevail in the absence of contravailing evidence. Dravo v. Fabel (D. C.) 25 Fed. 116; Dravo v. Fabel, 132 U. S. 487, 10 Sup. Ct. 170, 33 L. Ed.' 421; U. S. v. Clark (C. C.) 125 Fed. 774; U. S. v. Clark, 138 Fed. 294, 70 C. C. A. 584. There are some matters connected with the acquisition of title to some of the lands and the payment therefor which are calculated to arouse suspicion as to the good faith of the transaction, but they are not sufficient to overcome the positive testimony in the case, and could probably have been explained but for the untimely assassination of Ex Governor Steunenberg.

It is argued on the facts as disclosed by the evidence that the plaintiff is entitled to relief because the contract of March, 1902, between Barber and Moon and Steunenberg contemplates the use by them of the timber and stone act to acquire title to a larger area of the public lands not then filed upon than the parties to the contract were entitled to take in their own right. That it is a fraud upon the government for an individual or an association of individuals to undertake to acquire a larger area of public land under the act referred to than such a party or association are entitled to in their own right may be conceded. U. S. v. Trinidad Coal Co., 137 U. S. 160, 11 Sup. Ct. 57, 34 L. Ed. 640; U. S. v. Keitel, 211 U. S. 370, 29 Sup. Ct. 123, 53 L. Ed. 230. But neither the contract nor the evidence in this case discloses such a scheme on the part of Barber or Moon or Steunenberg; on the contrary, the language of the contract, the subsequent correspondence between the parties, and the testimony of all of them, as well as their conduct, show that the intention was to acquire title by lieu land scrip to a sufficient area, with that already filed on, to make an aggregate of 25,000 acres, and not to use the timber and stone act for that purpose.

A large volume of correspondence of the defendant company and Barber and Moon concerning the matters involved in this suit has been read into the record. It is suggested, on behalf of the government, that this correspondence is probably a fabrication, and is unworthy of credit, because in one of Steunenberg's letters, dated February 3, 1902, reference is made to a certain Mr. Tipton "present Assistant U. S. Attorney," while, in fact, it is said Mr. Tipton was not appointed to that office until August, 1908, but this fact, standing alone and without any explanation whatever, is insufficient to discredit all the rest of the correspondence which was taken from the files of the defendant company and appears to have been had in the usual course of its business. It would have been quite impossible to have fabricated all of this correspondence, and, certainly if any one had done so, he would not have made the mistake occurring in Steunenberg's letter.

In reaching a conclusion in this case, I have not overlooked the testimony concerning what is known as the Wells and Granger and Anderson groups of entries made in the Boise Basin in September,

1907, nor the influence from high sources said to be brought by defendants or some of their agents to bear upon the special agent detailed by the Department to investigate these entries. None of them are involved in this suit. They were canceled by the Department, and never passed to patent. The evidence in relation thereto, therefore, has but little if any bearing upon the question of whether the particular entries mentioned in the bill of complaint were made in the manner and for the purpose therein alleged, and that is the sole question to be determined in this case.

Upon the whole record, my conclusion is that the averments of the bill are not sustained, and that it should be dismissed. Let a decree be entered accordingly.